# In the United States Court of Federal Claims

No. 15-881C
Filed: June 27, 2019

|  |  |  |
|---|---|---|
| ALUTIIQ MANUFACTURING CONTRACTORS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | Termination for Default; Contract Disputes Act; Contract Performance; Public Contracts |
| THE UNITED STATES, | ) ) | |
| Defendant. | ) ) ) | |

*Mark Jackson*, *Stowell Holcomb*, Jackson Rosenfield LLP, Seattle, WA, for plaintiff.

*Eric Laufgraben*, *Ashley Akers*, *Aaron Woodward (for the first part of the case)*, *Matthew Glover*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

**OPINION AND ORDER**

*SMITH*, **Senior Judge**

This case concerns a contract in which a number of disputes, poor practices, and conflicting personalities created a climate of dishonesty, distrust, and lack of effective communication. This resulted in a default termination, and performance concluded more than a year late on a time-critical project. Plaintiff's Exhibit (hereinafter "PX") 237; *see also* PX 181 at 9. Plaintiff, Alutiiq Manufacturing Contractors, LLC ("AMC"), began performance with a defective management team that delayed the project by at least thirty days. Joint Exhibit (hereinafter "JX") 129; PX 129; PX 157. AMC's early lack of diligence and inability to produce an adequate Contractor Quality Control ("CQC") Plan was just incompetence, but it did not incurably delay the project. *Id.* While there were clear deficiencies in AMC's contract performance, those deficiencies would not have been fatal to completion of the contract within thirty days or less of the 400-day performance deadline.

AMC's early problems engendered hostility towards the contractor among the government's contract management personnel. *See* PX 154 at 1. In the months prior to the June 8, 2015 Termination for Default, the contractor replaced its management team and attempted to remedy some of the deficiencies noted in this opinion. Trial Transcript (hereinafter "Tr.") 67:20–68:20; PX 140 at 3–4; Tr. 784:8–12. AMC's new management team took steps to resolve various problems with the project, including procuring an asphalt subcontractor and remedying lingering scheduling difficulties. JX 78 at 1–3; PX 95; Tr. 505:2–18; PX 181; Tr. 281:16–284:13; Tr. 823:13–19; PX 186. However, the United States Department of Defense, National Guard Bureau ("Agency"), gave AMC no real chance to implement a more rapid schedule, and

its analysis of whether to terminate Contract No. W90FYQ-14-C-0001 ("Contract") ignored important sections of the Federal Acquisition Regulations ("FAR"). *See* PX 190 at 3. Most tellingly, the follow-on contractor encountered some of the same problems as AMC. *See* PX 111, 112, 113, 115, 118; *see also* PX 252 at 2–3.

The improvident termination for default delayed completion by approximately a year. This would be more than a year after the contract's deadline if cleanup is counted. Final completion would be delayed until 2017, significantly later than the 2015 deadline. Therefore, the Agency's decision that the contractor could not possibly have completed the contract cannot be supported by the facts found and noted in this opinion. The termination for default must be converted to a termination for convenience.

   I.   **Findings of Fact**

       A. **The Solicitation, Bid, and Award of the Contract**

On May 15, 2014, the Agency issued Solicitation No. W90FYQ-14-R-0002 ("Solicitation") for repair of the Main Apron Access and Alert Pavements at Buckley Air Force Base in Aurora, Colorado ("Buckley"). Defendant's Exhibit (hereinafter "DX") 1201 at 1. The Solicitation was a 100% Small Business Set Aside, which required the successful offeror to complete fifteen percent of the work but allowed subcontractors to complete the remainder of the project. DX 1201 at 1, 43; Tr. 2279:21–23. On August 14, 2014, AMC, an Alaska Native corporation and small business, was awarded Contract No. W90FYQ-14-C-0001 to perform the repair project. PX 2 at 2; Tr. 91:23–25, 315:16–17.

The Contract incorporated several provisions of the FAR by reference, including FAR 52.236-6 (Superintendence by the Contractor) and FAR 52.249-10 Default (Fixed-Price Construction). PX 2 at 12–14. The Agency and plaintiff agreed on a firm-fixed price of $13,680,965. PX 10 at 2. On September 16, 2014, the Agency issued a Notice to Proceed ("NTP") to AMC. PX 5.

The Construction Specifications divided the project into four sequences of work and a period of mobilization as follows:

| **Sequence:** | **Allotted Time:** |
|---|---|
| 1A and 1B | 99 days |
| 2A, 2B, and 2C | 149 days |
| 3 | 50 days |
| 4 | 53 days |
| Mobilization and Closeout | 81 days |

PX 3 at 58–60. The total number of days allotted for completion was 432 days. DX 1201 at 41.

### B. Plaintiff's Contract Performance

AMC encountered problems during the early stages of contract performance. The Contract required that plaintiff provide key personnel, supply and install asphalt, and submit a CQC plan. PX 2 at 40, 43. AMC repeatedly failed to satisfy some of its contractual requirements. *See* JX 129, 137; PX 129, 157, 237.

#### i. Personnel Gaps

The Solicitation required that the contractor staff its project with "key personnel," including a "Contract Manager, Project Manager(s), Site Superintendent(s), Quality Control Manager(s), Estimator(s), Safety Representative, [and] Scheduler." DX 1201 at 19. The Solicitation further directed that the listed individuals "have experience in managing projects/contracts of the same/similar dollar magnitude, size, complexity and scope, in the capacity in which they are proposed for this project." *Id*. The Contract required that the contractor utilize those employees "specifically identified in proposals or agreed to in negotiations." PX 2 at 43. In its March 24, 2015 Cure Notice, the Agency identified the following individuals as the key personnel "documented in [AMC's] original proposal": John Justice, Contract Manager; Josh Shafer, Quality Control Manager; Buddy Low, Lead Superintendent; Ed Hamlin, Site Safety Officer; Jeff Nolan, Project Manager; and Matt Nolan, Assistant Superintendent. JX 137 at 2.

In the Cure Notice, the Agency noted that four of the six key personnel included in AMC's original proposal "have not been performing work on the project." *Id.* Additionally, the Agency noted that Jeff and Matt Nolan were performing different roles than those in the proposal, which the Contract expressly prohibited absent written consent from the contracting officer. *Id.*; PX 2 at 43. AMC's personnel problems included turnover issues, lack of written approval by the CO for personnel changes, and continued gaps in its staffing plan. JX 140 at 4; PX 157 at 2; Tr. 180:1–182:12, 183:9–186:2, 253:12–254:15, 363:2–20, 401:8–19, 1282:17–1283:20. Some of these issues persisted until the Contract was terminated on June 8, 2015. PX 237.

#### ii. Hot Mix Asphalt Plan

The Contract required plaintiff to supply and install Hot Mix Asphalt ("asphalt") during Sequences 1B, 3, and 4. PX 35 at 1; PX 43 at 1–2; *see* 48 C.F.R. § 52.219-14. AMC sought a subcontractor to design and produce asphalt. PX 137 at 1. In its proposal, AMC budgeted $510,000 for a paving subcontractor, but it did not attempt to secure an asphalt subcontractor until after performance began. Tr. 171:18–21; PX 137 at 1. Plaintiff encountered difficulties in procuring a subcontractor that could meet the Agency's specifications, and several companies declined to provide a bid. DX 1015 at 16–17. On October 13, 2014, AMC informed the Agency that "all local asphalt producers have indicated their unwillingness" to meet the Agency's asphalt specifications and requested an amendment to the same. PX 35 at 1. On November 13, 2014, the Agency issued Addendum 4, which altered the asphalt specifications. *See* PX 36 at 1; DX 91; Tr. 2122:13–2125:5, 2441:22–2442:8, 2445:13–2446:8. Although never formally

3

incorporated into the Contract, both the Agency and AMC proceeded as if Addendum 4 modified the Contract. Tr. 1037:8–1038:1.

The parties disagree about the effect of Addendum 4. At the time, the Agency asserted that these changes resulted "in a significant lossening [sic] of the [asphalt] specification requirements." PX 36 at 1. AMC asserts that Addendum 4's gradation change made the Hot Mix Asphalt Specification even more difficult to meet. Tr. 1031:2–4, 2121:21–2122:12. Indeed, Addendum 4 tightened the Job Mix Gradation specifications, requiring that all asphalt aggregate pass through a one-half inch sieve, instead of the original gradation requirement of three-quarters of an inch. PX 36 at 1. On February 9, 2015, Jeff Nolan contacted Paving Maintenance Systems ("PMS"), who agreed to work as plaintiff's asphalt subcontractor on February 13, 2015. PX 41 at 1; PX 43 at 1–2; *see* PX 51 at 1.

At a meeting on February 26, 2015, the Agency and AMC discussed additional modifications to the asphalt specifications. *See* PX 49 at 2; PX 50; Tr. 695:1–696:24. Jeff Nolan and Mr. Murphy believed that the Agency agreed to a relaxed asphalt specification during that meeting. PX 64 at 1; Tr. 695:1–697:8. AMC and PMS began to work with WesTest, a design and testing company, and Brannan Sand & Gravel, a paving company, to develop an asphalt mixture that met the Agency's specifications contained in Addendum 4. PX 53; Tr. 678:22–679:10. On April 13, 2015, the Agency conditionally approved a design developed by WesTest. JX 78 at 1–3. However, AMC failed to secure an asphalt supplier who could produce aggregate in accordance with the WesTest design. PX 88. On May 29, 2015, AMC submitted an asphalt mix to the Agency based on a Colorado Department of Transportation ("CDOT") design. PX 95. The Agency rejected the proposed mix design on June 2, 2015, due to excessive sand in the CDOT design mix. JX 99 at 1; Tr. 2536:8–10.

### iii. Contractor Quality Control Plan and Routine Documents

Pursuant to the Contract, AMC was to submit a CQC plan within thirty days of the NTP, which the Agency issued on September 16, 2014. PX 3 at 179–181 (citing FAR 52.246-12); PX 5 at 1. The purpose of the CQC plan was to "identify [the] personnel, procedures, control, instructions, test, records, and forms to be used" in order to "implement the requirements of the Contract Clause entitled 'Inspection of Construction.'" PX 3 at 180; PX 2 at 14. The Agency's acceptance of the CQC plan was a prerequisite to AMC initiating performance. DX 1201 at 64; *see* PX 2 at 40; PX 3 at 181.

AMC failed to timely submit its CQC plan, which resulted in scheduling delays and delays to paving operations. Tr. 848:6–12; DX 1004 at 7–11; DX 777 at 1; Tr. 1566:6–23, 1576:4–10. AMC submitted its CQC plan five times, but the Agency rejected the plan each time. JX 137 at 3. The Agency provided AMC with administrative and technical templates to facilitate submission of the CQC plan. Tr. 2484:6–12; DX 97 at 1. On April 21, 2015, AMC submitted a final CQC plan, which the Agency approved on April 29, 2015. DX 1011 at 23; DX 102 at 1.

Additionally, the Contract required that AMC submit a variety of routine documents into an electronic database, including daily CQC reports, Project Record and As-Built drawings, and

construction photographs. JX 129 at 2–3. Plaintiff failed to timely submit these reports during the period in which the Nolans worked on the project. *Id.* The purpose of these reports was to update the Agency as to AMC's progress and compliance with the Contract. *Id.* AMC failed to submit some of these routine documents throughout the course of performance, despite the new management team's attempts to comply with this requirement. PX 157 at 3; PX 237 at 11–12.

### C. The Agency's Letter of Concern and Initial Cure Notice

On March 1, 2015, the Agency sent plaintiff a Letter of Concern. JX 129; PX 129. The Letter of Concern addressed AMC's repeated failure to upload administrative reports, daily CQC reports, Project Record and As-Built drawings, and construction photographs. JX 129 at 2–3. The Letter of Concern also noted that AMC "must comply with FAR 52.219-14," which requires a contractor perform at least fifteen percent of the work described in the Contract. *Id.* at 3; 48 C.F.R. § 52.219-14; DX 1201 at 43; Tr. 2279:21–23.

The Agency issued its Initial Cure Notice on March 24, 2015, stating that plaintiff's failure to meet contractual requirements "endanger[ed] performance of the contract." JX 137 at 1. The Initial Cure Notice identified several "issues affecting performance," including AMC's failure to procure an asphalt subcontractor, submit a CQC plan, fully staff key personnel roles, and submit Project Records and As-Built drawings. *Id.* at 1–3. The Initial Cure Notice also stated that plaintiff's submitted schedules were "unreasonable." *Id.* at 2. The Initial Cure Notice warned that unless AMC's "lack of compliance with the subject contract's requirements" was "cured within 10 days after receipt," the Agency "may terminate [AMC] for default" in accordance with FAR 52.249-10. *Id.* at 1; *See* 48 C.F.R. § 52.249-10.

### D. Plaintiff's Response and Revised Baseline Schedule

On March 31, 2015, AMC submitted its Letter of Response to the Initial Cure Notice. *See* JX 140 at 2–8. Mr. Gregory Strike, AMC's Vice President of Operations, addressing Ms. Marilyn Hill and Mr. Tom McKay, acknowledged the Agency's concerns and responded to each issue raised in the Initial Cure Notice. *Id.* at 3–4. Mr. Strike concluded by expressing AMC's desire to adequately meet the Contract's terms in order to "bring this project to a successful conclusion for all parties concerned." *Id.* at 4.

In the weeks after submitting its Response to the Agency's Initial Cure Notice, AMC took several steps to correct its defects. JX 78 at 1–3; PX 140 at 3–4. First, plaintiff worked with WesTest to develop an asphalt design, which the Agency approved on April 10, 2015. PX 53; Tr. 678:22–679:6; JX 78 at 1–3. AMC also made several personnel changes, including sending its program manager to oversee the project, hiring a new quality control manager, demoting Jeff and Matt Nolan, and hiring a new superintendent. Tr. 67:25–68:20; PX 140 at 3–4; Tr. 784:8–12.

On April 2, 2015, plaintiff submitted a revised baseline schedule, which the Agency approved on April 20, 2015, after comments and revisions. Tr. 551:5–555:9; PX 292 at 2–3; PX 151 at 2. AMC subsequently submitted its CQC plan. DX 1011 at 23; DX 102 at 1. The

Agency approved AMC's CQC plan on April 29, 2015, and AMC instructed its subcontractor to begin paving on the same day. PX 153.

### E. The Revised Cure Notice

On May 1, 2015, the Agency issued its Revised Cure Notice. PX 157 at 2. The Revised Cure Notice reiterated the Agency's concerns regarding AMC's performance and "lack of compliance with the subject contract's requirements." *Id.* at 2. Additionally, the Revised Cure Notice highlighted issues with the following four areas: the asphalt subcontractor; lingering personnel issues; "incomplete and out of date" Project Records and As-Built drawings; and routine photos, reports, and meetings that were not properly uploaded into the appropriate electronic database. *Id.* at 2–3. The Agency concluded that, based on the estimates of "onsite government personnel," AMC was "now at least 10% behind schedule," but that estimate could not be verified, as AMC's required weekly schedule updates were never submitted. *Id.* at 3.

### F. AMC's Response and Recovery Schedule

After receiving the Agency's Revised Cure Notice, AMC sent Mr. Darrell Brewer, its Senior Vice President of Operations, to oversee the project. Tr. 56:23–25, 64:15–25, 65:1–4. The Agency and AMC discussed the Revised Cure Notice at a conference call on May 6, 2015. PX 168 at 1. During that call, the Agency detailed the shortcomings in plaintiff's management of the Contract, and Mr. Brewer assured the Agency that AMC would do "everything in [its] power" to correct the deficiencies. *See* DX 1011 at 4–7; PX 168 at 1.

AMC detailed the steps it was taking to address the Agency's concerns in its Letter of Response to the Revised Cure Notice. PX 185. Namely, AMC stated that it signed a contract with PMS, hired a new quality control manager and a new project manager, and uploaded daily reports and project photos for several weeks of work. *Id.* at 2–3. Furthermore, AMC acknowledged that the project was "behind schedule," citing "unsuitable soil" encountered while excavating, for which the baseline schedule did not account. *Id.* at 4. These unforeseen delays, combined with "the numbers of changes experienced to date," led to difficulties in accurately updating AMC's schedule. *Id.* Nonetheless, AMC believed that its scheduling issues were "under control" and promised to provide the Agency with a "three-week look ahead" on a weekly basis. *Id.*

AMC worked with its chief subcontractor, Concrete Works of Colorado, to develop a recovery schedule. PX 171; PX 173; PX 174; Tr. 814:3–17; Tr. 1617:17–22. The recovery schedule, completed on May 14, 2015, and delivered to the Agency on Friday, May 15, 2015, projected that AMC would compensate for the lost time by working on weekends and shortening some work durations. PX 181; Tr. 281:16–284:13; Tr. 823:13–19; PX 186; Tr. 931:25–932:4. The recovery schedule anticipated a completion date of November 20, 2015, two days prior to the Contract's projected completion date. PX 181 at 9; DX 1201 at 41.

6

**G. Termination for Default**

On the morning of May 15, 2015, before plaintiff delivered its recovery schedule to the Agency, Ms. Hill asked Mr. McKay to "prepare a draft [Memorandum for Record] for [Termination for Default]." PX 183. A conference call was held on May 18, 2015, between Col. Niichel, Ms. Hill, and others, characterized as the "[Termination for Default] discussion," to assess AMC's performance and the potential for a termination for default. PX 189 at 1. During that call, Col. Niichel "provided technical input," regarding his analysis of the recovery schedule's "logic and reasonableness." PX 256 at 6. Col. Niichel's assessment of the May 14, 2015 recovery schedule consisted of a one-page, thirteen-point list, which he sent to the participants of the May 18, 2015 discussion. PX 190 at 3.

Col. Niichel's "quick glance" analysis described his concerns regarding the recovery schedule and posed questions resulting from those concerns. Tr. 931:5–8; *see* PX 190. For example, point four reads, "S2A trench drain and S3 paving are scheduled in the same time frame—both are labor intensive[.] How will this be accomplished? [M]ore crews at night?" PX 190 at 3. The list includes assessments of the May 14, 2015 recovery schedule, but those assessments were not well supported. *Id.*

Neither Mr. McKay nor Ms. Hill performed a critical path analysis; instead, both relied on Col. Niichel's assessment of the viability of AMC's May 14, 2015 recovery schedule. Tr. 947:6–12. Additionally, only Col. Niichel's thirteen-point cursory assessment of AMC's May 14, 2015 recovery schedule was conducted prior to the June 8, 2015 Termination for Default. Tr. 935:21–937:3.

On June 4, 2015, the Agency sent a Notice of Imminent Default to plaintiff's surety, Liberty Mutual Insurance Company, alerting it to the impending termination for default "in accordance with FAR section 49.402-3(e)(2)." PX 229 at 2. On June 8, 2015, the contracting officer issued a notice to AMC terminating the contract for default in accordance with FAR 52.249-10, Default (Fixed Price Construction). PX 237 at 2; 48 C.F.R. § 52.249-10. The June 8, 2015 Termination for Default described three primary grounds upon which the contracting officer based his decision: (1) AMC's alleged failure to "prosecute the construction project with the diligence that will ensure its completion within the time specified in the contract"; (2) AMC's alleged failure to "provide adequate assurances that it would complete the construction within the time specified in the contract"; and (3) AMC's alleged failure to adhere to contractual provisions such as providing "adequate supervision on a recurring basis" and compliance with requirements concerning the qualifications of key personnel. PX 237 at 2.

Specifically, the contracting officer outlined five "acts or omissions" in justifying his decision to terminate for default. *Id.* at 7, 9–13. These conditions included AMC's inability to secure an asphalt subcontractor; personnel gaps in AMC's management team; AMC's failure to submit project records and As-Built drawings; AMC's failure to submit routine documents and photos; and "a belief of the onsite government personnel that the project is now at least 10% behind schedule." *Id.* at 9–13. In response to the termination for default, AMC initiated this litigation. *See generally* Complaint (hereinafter "Compl.").

## II. Procedural Background

AMC brought the present action seeking various forms of relief pursuant to the Contract Disputes Act, 41 U.S.C. §§ 7101–7109. Plaintiff alleges that defendant did not possess adequate grounds for issuing a termination for default to AMC for the Contract to undertake the repair of the Main Apron Access and Alert Pavements at Buckley Air Force Base in Aurora, Colorado. *See generally* Compl.

On August 14, 2015, AMC filed its Complaint arguing that the Agency improperly terminated AMC's contract for default. *See generally* Compl. Plaintiff seeks the following three forms of relief: (1) an Order declaring that the contracting officer improperly terminated the Contract for default; (2) an Order declaring that the default termination shall be converted to a termination for the convenience of the government; and (3) any other relief the Court deems just and equitable. *Id.* at 18.

On October 6, 2017, before the close of discovery, plaintiff filed its Motion for Summary Judgment. *See* Plaintiff's Motion for Summary Judgment, ECF No. 26. The Court held oral argument on plaintiff's Motion for Summary Judgment on January 5, 2018. On January 9, 2018, the Court denied the motion, finding "genuine issues of material fact remained unresolved." Opinion and Order, ECF No. 37 at 3.

A trial was conducted April 10–13, 2018 and April 16–19, 2018 in Denver, Colorado; May 15–18, 2018 and May 30, 2018 in Washington, DC; and on August 1, 2018 in Denver, Colorado. Additionally, a site visit was held on August 3, 2018 at Buckley Air Force Base. The parties filed initial post-trial briefs on November 9, 2018. *See* Plaintiff's Post-Trial Brief; *see also* Defendant's Post-Trial Brief. On February 27, 2019, plaintiff and defendant filed their respective post-trial responses. *See* Plaintiff's Post-Trial Response Brief; *see also* Defendant's Post-Trial Response Brief. Closing argument was held on March 5, 2019, in Washington, DC. This case is now ripe for decision.

## III. The Trial Testimony

The trial record consists of the testimony of seventeen witnesses. Plaintiff presented the testimony of the following eleven witnesses, one of which was called back as a rebuttal witness to the government's case in chief:

- *Darrell Brewer*, Senior Vice President, Alutiiq Manufacturing Contractors, LLC;
- *Bill Butler*, Project Manager, Alutiiq Manufacturing Contractors, LLC;
- *Jodie Tinucci*, Scheduling Consultant, Alutiiq Manufacturing Contractors, LLC;
- *Jon Joesten*, Quality Control Manager, Brannan Sand & Gravel;
- *Charles Murphy*, Co-Owner, Pavement Maintenance Services;
- *Edgar (Cy) Young*, Lead Superintendent, Alutiiq Manufacturing Contractors, LLC;
- *Colonel Thomas Niichel*, Construction Manager and Contractor Officer's Representative, U.S. Air Force;
- *Jacinto Cabello*, Consultant and Construction Manager, Vertex Companies;

- *Thomas McKay*, Administrative Contracting Officer, National Guard Bureau;
- *Richard Root*, Asphalt Expert, Root Pavement Technology, Inc., also as a rebuttal witness;
- *Mike Dean*, Scheduling Expert and Owner, Pacific Construction Consults.

Defendant presented the testimony of the following six witnesses:

- *Robert Tudor*, Estimator and Project Manager, Concrete Works of Colorado;
- *Keary Brown*, Estimator and Project Manager, Asphalt Paving Company;
- *Richard Brasher*, Vice President, Concrete Works of Colorado;
- *Marilyn Hill*, Procurement Analyst/Procuring Contracting Officer, National Guard Bureau;
- *Lieutenant Colonel William Smith*, Base Civil Engineer, U.S. Air Force;
- *Stephen Weathers*, Scheduling Expert, Capital Project Management.

## IV. Discussion

### A. Legal Standards

*Lisbon Contractors, Inc., v. United States*, 828 F.2d 759 (Fed. Cir. 1997), provides the standard for assessing an Agency's decision to terminate a contractor for default. In *Lisbon*, the United States Court of Appeals for the Federal Circuit ("Federal Circuit") ruled that the government must demonstrate a "reasonable belief on the part of the contracting officer that there was no reasonable likelihood that the [contractor] could perform the entire contract effort within the time remaining for contract performance." *Id.* at 765 (internal citations omitted).

The Federal Circuit provided additional guidance on the proper interpretation of the *Lisbon* standard in *McDonnell Douglas Corp. v. United States* (*McDonnell Douglas XII*), 323 F.3d 1006 (Fed. Cir. 2003). Specifically, the Federal Circuit ruled that a termination for default must be based on "tangible, direct evidence reflecting the impairment of timely completion," and that "a court's review of default justification does not turn on the contracting officer's subjective beliefs, but rather requires an objective inquiry." *Id.* at 1016 (citing *Lisbon*, 828 F.2d at 766–67). The Federal Circuit directed this Court to "focus on the events, actions, and communications leading to the default decision in ascertaining whether the contracting officer had a reasonable belief that there was no reasonable likelihood of timely completion," and suggested this Court consider the following factors:

> a comparison of the percentage of work completed and the amount of time remaining under the contract, the contractor's failure to meet progress milestones, problems with subcontractors and suppliers, the contractor's financial situation, as well as a contractor's performance history, and other pertinent circumstances surrounding the [contracting officer's] decision.

*Id.* at 1016–17 (internal citations omitted).

The *McDonnell Douglas XII* court stated that, to make such a determination, this Court must ascertain the "actual performance that the contract requires and the amount of time remaining for performance." *Id.* at 1017. Part of the Court's analysis involves establishing whether the contracting officer had determined "the entire effort required under the contract and the time left to complete the contract." *Id.* Absent such analysis, it would be "difficult, if not impossible, for [the contracting officer] to resolve whether 'there was no reasonable likelihood that the contractor could perform the entire contract effort within the time remaining for contract performance.'" *Id.* (citing *Lisbon*, 828 F.2d at 765) (emphasis omitted).

The FAR governs default and the procedure for issuing a termination for default. *See* 48 C.F.R. §§ 52.249-10, 49.402-3. FAR 52.249-10 empowers an agency to "terminate the right to proceed with the [contract] that has been delayed." 48 C.F.R. § 52.249-10(a). However, FAR 52.249-10 also allows a contractor to avoid termination if such delay "arises from unforeseeable causes beyond the control" of the contractor, so long as the contractor "notifies the Contracting Officer in writing of the causes" within ten days of the cause of such delay. 48 C.F.R. § 52.249-10(b)(1)(2).

FAR 49.402-3 governs the process for and considerations involved in an Agency issuing a termination for default. Specifically, FAR 49.402-3(f)(1)–(7) lists the following factors for the contracting officer to consider before issuing a termination for default:

> (1) The terms of the contract and applicable laws and regulations; (2) the specific failure of the contractor and the excuses for the failure; (3) the availability of the supplies or services from other sources; (4) the urgency of the need for the supplies or services and the period of time required to obtain them from other sources, as compared with the time delivery could be obtained from the delinquent contractor; (5) the degree of essentiality of the contractor in the Government acquisition program and the effect of a termination for default upon the contractor's capability as a supplier under other contracts; (6) the effect of a termination for default on the ability of the contractor to liquidate guaranteed loans, progress payments, or advance payments; (7) any other pertinent facts and circumstances.

48 C.F.R. § 49.402-3(f)(1)–(7).

### B. Termination for Default

The Court applies the *Lisbon* standard to determine whether the Agency's decision to terminate AMC for default was proper. It seems clear to this Court that the Agency's default termination does not pass *Lisbon* muster when evaluated through the framework outlined in *McDonnell Douglas XII*. *See generally McDonnell Douglas XII*, 323 F.3d 1006. Both *Lisbon* and *McDonnell Douglas XII* point out that the government cannot "satisfy its burden by merely showing that the contractor was behind schedule." *McDonnell Douglas XII*, 323 F.3d at 1016 (citing *Lisbon*, 828 F.2d at 765–66). Rather, the Court asks whether there was a "reasonable belief on the part of the contracting officer that there was no reasonable likelihood that the contractor could perform the entire contract within the time remaining for contract performance."

10

*Lisbon*, 828 F.2d at 765. Both courts held that "the contracting officer's termination decision be based on tangible, direct evidence reflecting the impairment of timely completion." *Id.* (citing *Lisbon*, 828 F.2d at 766). The Court's review then turns on an objective inquiry that "does not turn on the contracting officer's subjective beliefs." *Id.* (citing *Lisbon*, 828 F.2d at 766–67). When making that inquiry, the Court may consider the factors listed in *McDonnell Douglas XI*. *Id.* at 1016–17 (internal citations omitted).

In analyzing whether the contracting officer possessed a "reasonable belief" that there was no likelihood of timely completion when he issued the termination for default, the Court asks, in part, whether the Agency conformed to FAR regulations in making that determination. If the Agency terminated AMC prior to analyzing its performance and recovery schedule, rather than following guidelines set out in the FAR, then the Agency's decision was not reasonable.

The administrative contracting officer, Mr. McKay, seems to have had limited involvement in the project's operation. Tr. 944:5–18, 947:6–14. The procuring contracting officer, Ms. Hill, was based in Michigan and received the dispositive information regarding AMC's performance from Col. Niichel. PX 256 at 3, 6; Tr. 2258:16–22, 2297:4–11. As Col. Niichel supplied the analysis that informed the Agency's termination decision, the Court must evaluate Col. Niichel's actions and credibility in order to adequately determine whether the Agency properly analyzed AMC's performance and likelihood of timely completion in accordance with the FAR.

The FAR directs the Agency to assess a variety of factors when considering a termination for default, and it seems clear to the Court that the Agency failed to do so. The Agency's analysis excludes any discussion of excusable delay, such as rain delays, or of the "urgency of the need" of the runway, and the "period of time required" for "other sources" to complete performance. DX 1015 at 16, 22; PX 26 at 8, 10, 14, 35; PX 190; 48 C.F.R. § 49.402-3(f)(2)–(3). The Agency also failed to consider whether AMC would complete the Contract "at least as soon as and probably much sooner than a successor contractor could have performed the unfinished work." *Darwin Constr. Co. v. United States*, 811 F.2d 593, 599 (Fed. Cir. 1987). This failure proved costly to the government.

Furthermore, the Agency's analysis ignored "any other pertinent facts and circumstances," such as the improvement in performance after the personnel changes, and the problems with the asphalt specifications. *Compare* PX 190, *with* 48 C.F.R. § 49.402-3(f)(7). Rather than analyzing each factor laid out in the FAR, the Agency only considered the first two factors, "the terms of the contract and applicable laws and regulations" and "the specific failures of the contractor," in its termination analysis. *Compare* PX 190, *with* PX 237 at 7–13; 48 C.F.R. § 49.402-3(f)(1),(2).

It appears to this Court that Col. Niichel's assessment of the recovery schedule was deficient and the decision to terminate for default had effectively been made by May 18, 2015. After the May 18, 2015 meeting, the Agency decided to terminate the contract for default without seriously considering the recovery schedule. Importantly, the June 8, 2015 Termination for Default letter cites to the April 2, 2015 revised baseline schedule despite the Agency having

possessed the May 14, 2015 recovery schedule for over three weeks. *Compare* PX 237 at 7, 12, *with* PX 181.

Col. Niichel's hostility towards AMC and the Nolans and his history of dishonesty,[1] further undercut the contracting officer's ability to form an independent and reasonable belief regarding plaintiff's ability to complete the contract on time. It seems apparent from the evidence that the Agency made its termination decision before it received the recovery schedule, and, if analysis occurred, it did not conform to FAR 49.402-3. 48 C.F.R. § 49.402-3(f)(1)–(7). The contracting officer's reasons for default termination include AMC's inability to secure an asphalt subcontractor; personnel gaps in AMC's management team; AMC's failure to submit project records and As-Built drawings; AMC's failure to submit routine documents and photos; and "a belief of the onsite government personnel that the project is now at least 10% behind schedule." PX 237 at 7–13. However, the issue of asphalt was a "red herring." The Agency's only substantive complaint regarding the asphalt was its concern over levels of sand in AMC's asphalt mix. JX 99 at 1; Tr. 2536:2–10. AMC's asphalt subcontractor stated it could have adjusted the sand levels to meet Agency specifications in "[a]bout a week." Tr. 645:4–12. Moreover, the Agency's approval of an asphalt mix for the replacement contractor that was substantively similar to AMC's mix demonstrates the Agency's bias towards AMC.

The Court does not believe that three of the remaining reasons for termination—personnel gaps, failure to submit project records and As-Built drawings, and failure to submit routine documents and photos—are sufficient on their own to justify finding that the contracting officer's belief regarding AMC's inability to complete on time was reasonable. While the Nolans only sporadically submitted the required documentation, AMC's new management team

---

[1]  The following quote from the trial transcript between plaintiff's counsel and Col. Niichel is illustrative.

> Q. You thought that Jeff Nolan had lied to you for months, right?
> A. Well, being that—as you know, Air Force core values are integrity first. When—and I truly believe that. And when somebody is lying, that is very concerning to the Air Force core values. So, yes, I was—I was rather upset.

Tr. 924:2–8.

> Q. You told him—he asked you specifically if you had contacted that contractor to reaffirm that they had met the spec, right?
> A. Yes, sir.
> Q. That was his question to you.
> A. Yes, sir.
> Q. Your response to him was unequivocal, yes, sir, right?
> A. Yes, sir.
> Q. That was a lie.
> A. Yes, it was.

Tr. 927:1–11.

improved the rate of document submission. PX 237 at 6–7. The June 8, 2015 Termination for Default letter acknowledges as much, stating "a review of records on 14 May 2015 indicates a marked improvement" with AMC's submission of project records and As-Built drawings. *Id.* at 11.

The Agency's final substantive reason for its June 8, 2015 Termination for Default was "a belief of the onsite government personnel [Col. Niichel] that the project is now at least 10% behind schedule." *Id.* at 7. However, Col. Niichel testified to lying during the pendency of this project, and he was accused of making "blatantly false" statements to JE Hurley Construction, Inc.'s employees. Tr. 927:10–11; PX 252 at 2. As a result of that dishonesty, it seems impossible that the contracting officer's evaluation of AMC's performance and likelihood of timely completion was based on a reasonably held belief.

It remains undisputed that AMC was behind schedule, but the parties disagree as to whether AMC could have met the goals of its recovery schedule in order to fulfill performance in a timely manner. Even if the Court were to agree with the government's assertion that AMC was incurably behind schedule, that is not enough to satisfy the requirements of a termination for default as set out in *Lisbon*. Again, the Court notes that the government cannot "satisfy its burden by merely showing that the contractor was behind schedule." *McDonnell Douglas XII*, 323 F.3d at 1016 (citing *Lisbon*, 828 F.2d at 765–66). With the appointment of the new management team, AMC began to make progress and improve contract performance. The termination for default failed to consider the May 14, 2015 recovery schedule, but, rather, relied on an analysis of the April 2, 2015 revised baseline schedule. Finally, the contracting officer relied on the assertions of Col. Niichel in determining that the project was at least ten percent behind schedule, a reliance that is heavily undercut by Col. Niichel's history of dishonesty and hostility towards AMC throughout the course of performance. Looking to the totality of the circumstances surrounding termination, it seems clear to the Court that the Agency's default termination does not satisfy the *Lisbon* standard. While the Court makes no findings related to whether or not AMC could have timely completed the contract, the Agency's default termination was so defective that it seems impossible that the contracting officer's decision was based on a reasonably held belief that AMC could not finish the project.

## V. Conclusion

For the reasons set forth above, the Court concludes that the government did not possess adequate grounds to terminate the plaintiff for default. Judgment is **GRANTED in favor of the plaintiff**. The termination for default shall be converted to a termination for convenience. The Clerk is directed to enter judgment in favor of plaintiff, consistent with this opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*
Loren A. Smith,
Senior Judge